The Recall Conspirators motion to dismiss the complaint was premised on the notion that Hutterville's corporate attorneys can perpetrate a fraudulent scheme, the purpose of which was to remove Hutterville's church officers and replace them with non-church members who are free from judicial scrutiny because the uncertainty they created about who may act for the church corporation. This is what the complaint alleges, that under the guise of a religious dispute, the Recall Conspirators created uncertainty about who may act for the corporation. They argue now that because that uncertainty they created exists and cannot be resolved without impermissible inquiry into matters of religion, that they're forever free from judicial inquiry or oversight. Common sense tells us that can't be the case, and when we look at the relationship between Article III standing, the First Amendment religion clauses, and the rules of civil procedure, we see that it does not make sense, because the district court erred in dismissing the complaint for lack of jurisdiction. We're here today to ask that this court reverse and remand for further proceedings. We need to start with an understanding of the chronology of events. Our briefs are lengthy, we've said a lot, and there are a lot of events described. We can distill that down to a few key events for the court. You would focus it for me, I've read all of the briefs and I've read the Supreme Court itself and noticed three decisions that are quite relevant. My question is, what predicate acts of erratic hearing, allegedly committed by the defendants, were in fact predicate acts if Mr. Whipp was an officer and director of the Brethren-Cotterville If we assume that Mr. Whipp was a duly elected and proper, there's no fraud, there's no sham elections, nothing. He was in control of the corporation and he approved the events, there would be none. That was the predicate of the district court's decision. So that in order to find a predicate act of erratic hearing, which is an element of a It would have to be determined that the Whipp faction was not, Mr. Whipp was not an officer and director of the Cotterville, correct? That would be correct. That's your First Amendment problem. Which takes us to the rule of civil procedure and the procedural posture of the case when it was dismissed. There was no answer, there was no discovery. We have a number of rules that apply here. We look at Rule 12b-1 and the district court, importantly, never, never Why isn't your answer to my question sufficient as to the procedural question? Because the court may apply to the fact, which it was not provided for. Why did the court not take judicial notice of these South Dakota Supreme Court cases? Why did it not? It's the law. Is the law applicable or potentially applicable to the case? As the district court said in its own opinion, many of the events that occurred were after these district court cases. The events of erratic hearing, etc. And the district court cases never happened before. The third and last events change the fact that we still don't know for sure who's in charge of the jurors. That again takes us to the rules of civil procedure. We've alleged in a complaint that the Walters aren't entitled to control this corporation. Under 12b-1, if this is a facial attack, those allegations are taken as true. Under 12b-6, if this is a facial attack, those allegations are taken as true. If this is a factual attack on the pleadings, we just submitted a Constitution Party in Pennsylvania case of 2014, facing the Third Circuit, which says that if no answer's been filed and there's been no discovery, if it's a 12b-1 factual attack on the pleadings, and they did refer members outside the pleadings here, that a motion made before the answer is filed is by definition a facial attack. So what do you want to do if we remand? What's your next move? We'd like to give Discovery an opportunity to prove our claim that the witness was not an officer directly. That he was not even a member of the church when the recall experience... That goes without saying. They're the same. Correct. So you want Discovery on the answer that you, without pausing, gave to my question? Yes, Your Honor. And that's exactly what the Supreme Court of South Dakota said, is that we need permissible limitations. I disagree with that, Your Honor. The Supreme Court of South Dakota is the starting point. The Supreme Court of South Dakota three times has never said that. I was asking if it was the starting point. I was asking if that was the fair characterization of their decision. We cannot go further because the First Amendment prohibits us from deciding who are, in fact, the church members, officers, and directors of the colony. That's only part of what the Supreme Court said. Of course, but that's the only part that mattered to the district court. Why isn't that correct? Because the other part of what the Supreme Court of South Dakota said is that the church gets to decide who its members are. The church has decided that. Under the Ecclesiastical Deference Doctrine, the court is bound by the church ruling on who are its members and who aren't. I thought the whole issue that stopped the Supreme Court of South Dakota cold was whether the election of October 2009 was valid, which turned on whether the excommunication of the Wipf people who were replaced by that election was valid, right? Have I got this history wrong? Yes, partially. What's wrong? What's not partially? What part's wrong? The issue before the Supreme Court in that case is Johnnie Wipf sued. He wanted the court to declare him to be the president. He wanted the court to do that based solely on the arguments of incorporation and the bylaws of incorporation in the election that was held. The court said, because religion is interwoven through these documents, we can't look just at corporate law in South Dakota. The church has to decide who the members are. And I'm telling the court today that the church has decided who the members are, and it's the Walters, and it's not Johnnie Wipf. And the church made that decision before the corporate attorney, Jeffrey Spence, and his law firm came in and tried to place Wipf in power. He had already been removed by the church, stripped of all authority to act for the corporation. And that's the chronology I was alluding to when I started my argument. There was no religious dispute. It was all part of the election fraud, and it was all part of the election scheme. Which, again, if I could for the court to summarize a couple of historical facts, 1983, Hunterville was formed as a non-profit corporation, a church corporation. George Walters was the minister and president. 1992, about ten years later, the church was formed. Are you still the duly elected when you talk about that? Are you still the newly elected? You're talking October of 1909 or events since then? 1983, I was referring to, when the Hunterville was first formed. George Walters was its first and original president and minister. That's the duly elected. Look, you don't need discovery to rest on that. Your Honor, I was alluding to your chronology of events. No, no, you said that the reason there's a bogus religious dispute is it's crystal clear the church membership duly elected the Waldner faction. And I ask, do you mean when you say duly elected the October of 1909 election? And you said no, 1983. Now I'm really confused. I either misspoke or you misunderstood me. What I was trying to say is that in 2008, long after, many years after this church split, Is there no answer to my question? I asked you what duly elected event do you believe discovery will allow you to prove there is no religious dispute? You said it will demonstrate that the membership duly elected the Waldner family. All I asked was when. If it was the October of 1909 election, then you're arguing the contrary of the Supreme Court of South Dakota. If it was something later, please enlighten me. Our argument, Your Honor, is that George Waldner was elected president in 1983. He has always been the president. He was never removed. And the point I've been trying to make is that in 2008, Johnny Griff had been a member of Hutterville. He had been a member of the group one church for the entire time. In 2008, he voluntarily submitted himself to discipline before a ecclesiastical tribunal of 55 ministers. Those ministers stripped him of all authority to act. In any capacity for Hutterville, he can't be elected. Was that before the Supreme Court of South Dakota ruled? Yes, it was. So they had that information? Although it wasn't argued there. The cases there focused solely on the corporate documents and South Dakota corporate law. Well, you've talked about events that have happened since the Supreme Court's ruling. At what events, and maybe I'm repeating the question from Judge Loken, but what events since that ruling have changed, modified, altered in any fashion any ecclesiastical ruling on who is in charge of this colony? There have been a number of events. One that we briefed is the United States Department of Agriculture final ruling. We had a contested trial for an administrative hearing officer. I'm sorry to interrupt, but that's the Department of Agriculture. What is the church? The church ruled in 2008 that Whip had not been a member. He was stripped of authority. The church has since, in this case, submitted affidavits from the highest authorities in the church What has happened in the hierarchy of the church since the South Dakota Supreme Court case that would change the result of the South Dakota Supreme Court decision to issue the Supreme Court a new discovery? Well, one thing, again, it's this United States Department of Agriculture hearing. We had a full trial on the merits. Scotty Whip was represented by counsel. Again, the Department of Agriculture can't change the Supreme Court and the South Dakota Supreme Court ruling. What happened, not outside, not some third party external thing, what happened, if anything, in the church, that resolved this dispute that the South Dakota Supreme Court said is so interrelated with religious issues that we can't resolve it? Well, that gets back to an understanding of what the Supreme Court actually decided. Again, those cases were focused solely on South Dakota corporate law. The court said, I'm not going to use South Dakota corporate law to decide this dispute. It's a religious dispute. Only the church can decide. At that stage, they were already on appeal to the South Dakota Supreme Court. They couldn't bring in evidence at that point that Whip had been dismissed from the church in 2008. We can do that now. And we're asking for an opportunity to prove that. Well, here's something that I'll give you a chance to explain. In the state court, in what I guess we call Article 1 or Article 2, your clients, union clients, took the position that this was a religious matter that could not be resolved. And now you're saying, fairly inconsistent with that, that yes, we can go forward in this case. And that bothers me in that you're taking inconsistent positions. You got the benefit of it the first time. You won. And now you're coming in here and taking what sounds to me like an inconsistent position. So educate me on why this is not contrary to what you said before. What we said on the South Dakota Supreme Court is that the court cannot look solely to corporate documents to determine this dispute. We've since discovered, of course, that those documents are eventually all fraudulent and part of this scheme. But what we said there is, don't look just at the corporate documents. You have to look at what the church has decided. And the court agreed with us there. It said, yes, we have to look at what the church decided. This is not a corporate law dispute. So to that extent, this is absolutely inconsistent because we're here before you today saying we have to look at what the church decided. And not only do we have to look at it, but the court is bound to accept it in a series of at least five United States Supreme Court decisions, including the Milahoyevich case, which is often cited. I've reserved five minutes for rebuttal. Unless the court has a question, this time is probably the appropriate time to stand up. Thank you. Steve, you've divided your time up. Let me have Lise and Mr. Waller. Thank you, members of the court and counsel. My name is Tom Wall, after Stu Ball. Along with me is Michael Tobin, who we represent lawyers Spen, Tobin, and their law firm, Siegel Barnett. Mr. Anderson represents Hardy Jewett, whose actions in this matter relate to his actions as a receiver. And Mr. Anderson will have five minutes. The decision of the district court to dismiss the amended complaint should be affirmed on the grounds of a lack of subject matter jurisdiction because of the First Amendment issues and a lack of standing by the plaintiffs under Article III and under the principles of prudential standing. It's not jurisdiction over the case. Subject matter jurisdiction on the First Amendment, Your Honor. That's jurisdiction over issues. What briefs are in the briefs that are wrong on this, in my view? Well, I believe it's a subject matter jurisdiction issue, Your Honor, and that the First Amendment precludes the district court. That may be, but the Supreme Court has said this does not deprive these issues. The First Amendment may deprive the court of jurisdiction to decide an issue, but not to decide a case. Not to decide. That is correct. That's a very, very important distinction that both sides... Well, the court always has jurisdiction to decide jurisdiction. This is different than that. This is not like lack of personal jurisdiction over a pardon. This case, as the judges have already indicated, is actually the fourth judicial forum in which the entanglement of the corporate control of the Hutterville colony has been addressed. I think it's important. There were three cases, as several of the justices have determined in the Supreme Court. South could address that. It's important that the third case was never addressed in the briefs by the appellants. That involves the receiver issues and all that, and basically that trilogy, as you've all read, is there was a corporate dispute as to who were the officers in one, and two, it was an issue about dissolution, and three was the issues arising out of the dissolution. The Supreme Court of South Dakota squarely, on First Amendment grounds, said that they cannot be entangled in the First Amendment issues and that these matters only lie with the ecclesiastical courts. And the issue of who controls Hutterville is the seminal issue in this case. That's why this case cannot be brought, because this court, under the First Amendment grounds, cannot determine who controls Hutterville. Do you disagree with opposing counsel that something happened in 2008, the church made the decision, and that that just wasn't able to be addressed by the Supreme Court? No, Your Honor. I don't believe anything material has happened other than the arguments of the appellants that third parties are looking at these issues. Mr. Wythe filed an affidavit that talks about what happened in the vote, the excommunications, they went back and forth, and both sides are saying, Your Honor, that, look, we are the one true church we control. That issue still remains today. That's unresolved by anyone. And people can take various parts of what happened at various corporate meetings, but there's no final resolution. Let's pursue the breadth of that. The hypothetical that comes to my mind is, I'm not sure what agricultural areas the county is in, but assume beef cattle is one of them, and a feedlot operator purchases $100,000 worth of beef cattle from the colony on day one. And a few days later, they get in the mail two otherwise identical invoices. One saying, pay the colony $100,000 and send the check to Johnny with the address paid. And the other says, pay the colony $100,000, send the check to Waldner at address B. And, of course, that's enough for diversity jurisdiction. The feedlot operator goes to his lawyer, and the lawyer says, file an interpreter action in federal court. So the operator puts $100,000 in the clerk of district court's account for such matters and says, pay it to whoever gets it. What does the district court do? I can't determine the dispute, because I can't. So what happens? Well... Who gets it? Is it the chiefs of the state? It would either have to be negotiated, or ultimately, I expect, it would probably be a cheat if they cannot agree on where it goes, but the district rules are... Who are decided as chiefs? Well, it's just like the court would have to decide as part of its... You said the court can't decide anything. Well, it decided like it did the receivership, ancillary issues. That's what the court did on receivership issue in the Supreme Court. So there are some issues that the court, in monitoring its own docket, would take care of. But if that's the principal substantive issue, I don't know what happens. But I just painted a classic property dispute that the federal Supreme Court in the United States has said, yeah, you can do those. But you can't do those disputes if the ultimate issue that has to be decided is an ecclesiastical dispute as to who controls the corporation. In order to get that... I can't the court say that it's obvious from the invoices and whatever else on the factual inquiry. It's obvious there are two churches. The question is which church gets it. I can decide that. It's a property question. I don't believe that that's what the court could do, Your Honor. That's a frustrating situation. But we have to deal with the situation that the courts can't solve all issues in this world. And that's one of those issues they can't solve. It's a public safety issue. I mean, violence. I understand that at least this is a pacifist religion, and I respect that. But this is right for violence. It is. And I believe that when we deal with individual torts, and you're more real than you understand, Judge, that there is issues that are happening in this colony. And it's more frustrating than ever is the violence that is happening. And in those situations, and if you look at the footnote of Judge Pearsall in the case, you know, he's reserving those torts, those intentional torts that people are responsible for. They're always liable for the torts. Well, it sounds like the Peabody gets pretty freaked out because I don't think the court can do anything but return the check. Well, I think maybe the colonies might figure out who gets the money in that situation. We would hope they would figure out, rather than, we would hope they would do that. But this is one of those frustrating situations where the courts, I believe, and all judges who've looked at this case, feel the empathy for the people that are involved in this colony. But there are certain things in this world that the courts can't fix. And it involves entanglements with the First Amendment. That is. And I think it was said in the Supreme Court of South Dakota, this is not a matter for the secular courts. It's not. And unfortunately, as frustrating as it might be to all of us that want to solve this, it's not there. And so the district court did what it was obligated to do, and that was to dismiss this entanglement. Because the lawsuit against the lawyers can't be brought except by the corporation. The corporation only acts to its officers and directors, and who controls Hutterville is the essential issue that has to be decided. And if you can't decide that on a First Amendment grounds, the court has no choice but to dismiss. I wanted to talk a little bit about Judge Riley's argument about the inconsistent positions. Because I, too, was troubled. I think that really brings us into the realm of judicial stop for Judge Riley's observations, where a party takes two inconsistent positions. And the nicety of the position that was articulated here is that somehow there is a difference. It is clearly the Walger faction took the position twice before the South Dakota Supreme Court that subject matter jurisdiction precludes the court from looking at the dispute, including dissolution. If one would think of a situation in a corporation where we're saying we're deadlocked and we want to dissolve and liquidate, you would think that would be a situation where one could look at that. But the Supreme Court of South Dakota said no. To decide how, in order to liquidate or dissolve, dissolve and then liquidate, you have to determine a member has to do it, and we aren't going to look at the eligibility of the membership or directors. So they said we're done. And so what was left was Web 3 or Hutterville 3, however you want to characterize it, with the receiver issue. So they have taken, Judge Riley, inconsistent positions. And that is troubling. It seems, whatever one wants to argue, they fought twice in this court and twice with the Supreme Court that the first time it wasn't raised by them, but the other two cases it was. Let me shift gears a little. I tend to think there's jurisdiction here and they're standing. A lot of prudential standing arguments are really capacity-to-sue arguments, which is kind of really what we're talking about here. Who has capacity to sue? Let's get away from that. I'm going to assume you have jurisdiction. Why is this not a valid RICO claim just based on the allegations? Well, because of the capacity. Judge Logan wrote the decision with Sanford Medical where he dealt with the capacity-to-sue issue. In that case with Sanford Medical, it's the same thing here. They don't have the capacity to sue because in order to determine that, the Board of Directors has to be determined who can authorize the lawsuit. If Johnny Whiff is in control, he's going to file an affidavit and say there's no lawsuit. But we're here to plead and stay on. To get into capacity-to-sue, you're not going back into the same factual determination. Well, but in your Deblo decision in 1993, we dealt with some of these factual issues. And the court was very clear, Judge Beeney wrote that decision, that said, look, if you're going to do discovery, we allow discovery. But he said the district court cannot get into any issues that involve ecclesiastical church issues. And so that's what Judge Pearsall said. He said, look, from the competing affidavits, and this is a B-1 case, there's no way I can determine these issues without getting to the ecclesiastical First Amendment issue. Therefore, we're done. So lawyers would make more money, we'd spend a lot of time taking depositions, and we'd be back to the same point today on the capacity-to-sue issue. It's not going to change with the discovery. Well, isn't there a difference, though, in your plaintiffs here? One of them is the church, the Hutterville, Hutterville Brooklyn. And the other, we have the individual plaintiffs. Why are they? Well, it's... Why the individual... Why would the individual plaintiffs not be able to do the discovery? Because we have very unique plaintiffs. The uniqueness of the plaintiffs arises from their religion. It's a common... They have, as part of a membership in the Hutterite church, they have forgone all property rights. It's a common... As a part of a membership, they have given up their right to property. And in exchange for the right to property, they have the right to food. Is this my time or his? It's still mine. That's your time. Okay. I want to make sure I don't end up on Mr. Anderson's time. That is the reason why it's unique, Your Honor, is because they have disavowed property rights. So they individually don't have claims by their own membership in the commune. And their capacity as a director is determined by their membership in the colony, which is the First Amendment issue. So it's a circular argument. They're all complainants, and they don't have capacity as officers and directors. And I think it's important to understand the pleadings here, because if you look at the long pleading, they're all monetary damages. And there's been some briefing issues that have arisen on equitable claims. There aren't any equitable claims in the amendment complaint. They're all monetary damage claims. So you have plaintiffs who have forgone money and personal property and who are now trying to switch through the arguments an equitable claim to the officership. It doesn't make any difference. We're still back to this first square of the First Amendment, and you can't determine those issues as a matter of subject matter jurisdiction because you would have to involve and broil yourself in the controversy of what is a true Hutterite church and which member controls. And this is one that is very frustrating because there was a judge. One certificate judge in South Dakota determined who was the one, the only legal judicial determination in South Dakota, determined that Johnny Whiff faction was in control. The Supreme Court said, no, you can't do that. So if you're looking at who had the only judicial determination, it was the Whiff faction. And, by the way, of the 63 colonies in South Dakota, just to give you a perspective, and this is the judge's opinion below, only five colonies are in the situation of filing elder client censors. The other 58 are with the Whiff faction. So we have a majority. I know the numbers are not important, but just from a perspective, a factual perspective, that's what you have in South Dakota with these particular colonies that are issued. I would ask the court to exercise whether, if it believes it has Article III standing, then you do under the principles of credential standing, can make your decision whether you want to be embroiled in this. I don't believe you have standing because of the First Amendment issue, but under your toolbox, I'll call it judicial toolbox, credential standing, you can control your principles of what disputes that you decide. And I can see, at this dispute, something with the court want to be involved in and want to determine who is their one true church. We all might have personal beliefs, but is the court equipped to make that ecclesiastical decision? I suggest not. The case falls because of the First Amendment. I believe it falls because of Article III standing. And also, I believe the court could exercise its discretion on credential standing to dismiss the case. We'd ask you to respectfully affirm the disreport below. Thank you, Your Honors. Mr. Anderson. Thank you, Your Honor. Good morning. Good morning. Police Department and Counsel, I'm Rob Anderson. I represent Defendant Anatoly Harvey Jewett. Mr. Jewett was appointed by the trial court in South Dakota during the first of the three cases that ended up in the Supreme Court during the dissolution of the corporation. He was appointed, I think, to deal with exactly the type of problems that Judge Volkin inquired Mr. Welk about. That is, who's going to control these assets? Who's going to pay the bills? Mr. Jewett was dismissed by the district court, in this case, with prejudice. And that was because the district court determined that Mr. Jewett was entitled to absolute judicial or quasi judicial immunity. In doing so, he agreed with our state Supreme Court. And the state Supreme Court, in reaching that decision in the case that I recall with two, had an extensive record developed below by the state trial court in terms of Mr. Jewett's actions as receiver. The state and federal courts' determination of whether judicial immunity is applicable to judicial officers in the state. Was that determination based entirely on waiver? You mean on the waiver of? The untimely objection to Jewett's appointment as receiver. No, no. I'm sure it clearly was not, Your Honor. In the second WIPF case, I think it's the federal Supreme Court determined that Mr. Jewett was entitled to judicial immunity because he acted as an arm of the court. Both state and federal decisions are the genesis of this doctrine. They come from the same source. If he obtained the appointment by fraud or misrepresentation, why does immunity necessarily follow? I haven't seen a case that says you lose immunity by obtaining your appointment that way. I can believe that that may be the case, but there is no evidence on the record that he obtained his appointment by fraud, nor could there be good faith allegations. How come he held himself out as a sole practitioner when, in fact, he was a partner of Siegel Barnett? Well, that subject was delved into extensively during the state court proceedings, Your Honor, during numerous transcripts. And was it resolved only by the waiver decision? No, I think it was resolved overall by the controls and checks and balances that are in place for a receiver, in this particular case especially. Now receivers, as you pointed out before, don't come when your checkbook's full and when things are going well and everyone agrees. Receivers are appointed when times are tough. They're born out of economic distress and emotional upheaval, and we have plenty of that in this case. Mr. Jewett was appointed after the South Dakota trial court gave both sides the option to recommend candidates for appointment, and two names were offered. Mr. Jewett's name was selected by the court. There was no objection at that time, but I believe that the decision to grant Mr. Jewett immunity was based on a variety of factors because in order, as the courts point out, in order for receivers to avoid becoming a lightning rod or to avoid harassment by discontented litigants, which is one of the arguments in favor of granting judicial immunity to receivers, there are a lot of checks and balances there. One thing I will have to disagree strenuously with appellant's counsel on is the statement that all this was put together so that they could avoid or be free from judicial scrutiny. I believe free from judicial scrutiny are the words that were used. Nothing could be further from the truth in regard to Mr. Jewett. His actions were scrutinized ad nauseam here. There were a number of hearings. He testified. He submitted documentation. Everything was passed on by the court that appointed him with notice and opportunity to be heard on the part of the others who did scrutinize his actions and who lost in the trial court, lost at the Supreme Court, and now lost in district court. All this, I want to mention one thing, and I realize my time is limited, but this merges into the Rooker-Feldman doctrine and the issue-conclusion doctrines here. Appellants have raised... Now you're saying the district court error. Yes. I did not find Rooker-Feldman doctrine. I don't disagree with the district court's ultimate decision. The court was right for the right reason, but it could have been right for many others. Why don't you argue preclusion without Rooker-Feldman, which is what the Supreme Court has told us to do? Well, I did argue that, Your Honor, I think in my brief book. But I don't understand why you want to push the Rooker-Feldman rock up a steep hill when you've got a perfectly viable preclusion argument. Rooker-Feldman is one of the issue-conclusion arguments that I think is valid. In order to permit the RICO case to proceed against Mr. Jewett, decisions of the South Dakota courts must be either negated or nullified, and I think that's the root of these issue-conclusion arguments, including Rooker-Feldman. Because of the broad release granted by Mr. Jewett after numerous hearings, an opportunity can be heard. I see my time is up, and I'll certainly take any other questions. Thank you very much. Thank you. Mr. Olson? Time for Mr. Olson. Five minutes and 20 seconds. Thank you, Your Honor. Judge Kelly asked me when I was on the first round what happened since that might change things. There are two things that haven't I failed to mention. In 2012, and again in 2013, all after these South Dakota Supreme Court cases we've been talking about, Johnny Whipp was deposed twice under oath. In those depositions, he admitted the chronology of facts that we've been talking about today, and in particular, that in 2008, he voluntarily left Hutterville's church. Only after that did the regal conspirators attempt to put him in control. But for the fraudulent scheme that's been alleged and the complaint, there would be no dispute about who's in control, and there is no religious dispute. Judge Lowton also brought up an excellent example with the cattle feed lot. We have faced precisely that issue. Johnny Whipp submitted an application to the United States Department of Agriculture and said, send me a check for $238,000. The Walters submitted an application, same application said, send us the check for $238,000. How is that resolved? We had a trial on the merits. We introduced the very evidence that we told the district court we would introduce and what we put in our lease to this court. And on the merits, that tribunal decided that the Walters get the money because they're in control because Johnny Whipp is an uninvited guest on the property. He does not participate in management. He does not contribute any money to the corporation. He does not contribute any labor to the corporation. He's just there. That was the evidence. The evidence was also that in 2008, he was stripped of all authority to act by the church. They had an opportunity to appeal that to the very same United States district court that decided this case on this mystical night. They declined to take that appeal because they did. That administrator ruling is final, it's inclusive, and it's binding. And if given the opportunity... Well, if it's unconstitutional, I don't think it's going to be binding on this court. I mean, let's be real. They wouldn't have appealed it because if it was First Amendment wrong, the appeal wouldn't have resulted in them getting the money. So we just have a federal agency with no real Article III authority that's interpreting First Amendment, saying, making a perfectly rational decision, we owe somebody, we're going to pay somebody, and they did. In my view, that's all we have there. But what we're saying is that with that same evidence, we would get the same result, if given the opportunity to do that in the district court's agreement. The evidence would be virtually identical. The district court said no, you wouldn't. Because your evidence would require me to decide who is the true church, who are the true directors, who are the true members, and I can't do that. Richard, how is this evidence in front of the USDA, how is that not involving this board or USDA in resolving the church issues, the Ecclesiastical issues? Because based on Griff's own admissions, we proved that there is no religious dispute. That's the first inquiry the board must make. Is there a bona fide religious dispute, or is there not? If given the opportunity, we will show evidence that there is no bona fide religious dispute. There's a sham religious dispute created by the RICO conspirators for their own ends and their own economic gain. That's the point that seems to be lost in a lot of the briefings and a lot of the interviews. But for the scheme, there's no scheme here at all. Griff admits that he left the church. Griff admits that he had no authority to act in the church or the colony. Only after that did the conspirators try to put him in public. It's that unlawful scheme that's at issue here. Not who's in control today or who was in control yesterday. Regardless of who's in control, the question is, did the RICO conspirators attempt to put Griff in control by violating the law and committing a number of predicate acts? We submit to the court that we have an authority and that somehow we were bound by the USDA decision or that we were given some sort of weight in the law here. I think the court has thought about that. It was a full and fair opportunity to litigate. There was a decision on the merits. It was appealable to the United States District Court. And it's now filed. Griff was a party. He was represented. He's in privilege with the RICO conspirators if you believe the allegations of a complaint. This goes back to Alan B. McCurry. I don't think the U.S. Supreme Court has made it as clear as what you say. But whether by me or not, it certainly persuades it and it certainly shows the kind of evidence we can submit to the District Court if given the opportunity. We want the opportunity to prove that there is no religious dispute, which again, should be the first step in the inquiry. The District Court did not take the allegations of the complaint as true. Did not allow discovery and believed the opposing allegation that there is a religious dispute. That we think was clear error and that alone should send the case back. And I am honored to honor your honors. Thank you. Thank you very much.